THE BUNKER-RAMO CORP., APPELLEE, *v.* PORTERFIELD, TAX COMMR., APPELLANT.

232

(No. 69-523—Decided March 25, 1970.)

*Messrs. Hahn, Loeser, Freedheim, Dean & Wellman, Mr. Samuel G. Wellman, Mr. Robert L. Gray, Mr. Robert D. Markus* and *Mr. Earl C. Tingey,* for appellee.

*Mr. Paul W. Brown,* attorney general, and *Mr. Jon A. Ziegler,* for appellant.

O'NEILL, J. The appellee is a foreign corporation which is in the business of receiving and electronically processing stock and commodity sales and bid-and-ask data from the New York Stock Exchange, American Stock Exchange and the numerous commodity markets. This electronically-processed data is then stored in computers located at the Telecenter in New York and in Satellite computers located throughout the country, which data is then transmitted over leased wires to electronic equipment owned and installed by Bunker-Ramo Corporation upon its subscribers' premises.

There are no Satellite computers in the state of Ohio. Ohio subscribers are serviced by a satellite located outside the state.

The subscribers are, for the most part, stock brokers and stock brokerage houses.

Appellee's prospective customers must first make application to the various stock and commodity exchanges for the privilege of receiving the stock and commodity exchange data over appellee's electronic equipment. It is absolutely essential that a broker or security dealer have an executed contract with an exchange before it can receive data over appellee's equipment.

In consideration for the privilege of receiving data from the various exchanges through interrogation devices furnished by others, the contracting brokers and security dealers pay a monthly fee or royalty to the exchanges for the data created by the exchanges. The fees for the privilege of receiving exchange data from the New York and American Stock Exchanges, through interrogation devic-

es furnished by others, are billed by the exchanges directly to the brokers and payment therefor is remitted directly to the exchange. In the case of commodity exchanges, the privilege fees for receiving data through interrogation devices furnished by the appellee are billed and collected by appellee and remitted to the appropriate commodity exchanges. However, if a broker or securities dealer does not pay the privilege fee or royalty to the appropriate exchange for the privilege of receiving data through interrogation devices furnished by others, the contract for the privilege is cancelled and then appellee terminates its contract with the nonpaying subscriber.

With regard to quotation boards, as distinguished from the interrogation devices, appellee pays a royalty to the exchanges and this royalty is a part of the monthly charge made by appellee to its customers. The monthly royalties for "boards" are not separately invoiced by appellee to appellee's subscribers, as are the privilege fees or royalties charged by the commodity exchanges for the privilege of receiving data through interrogation devices.

Upon receipt of the approval by the exchanges of the prospective subscriber, the appellee installs quotation boards and/or interrogation devices upon the subscriber's premises in Ohio pursuant to contract.

Under the "quotation board" contracts, the appellee contracts with the subscriber to install and maintain on the subscriber's premises, at a location satisfactory to the exchanges, an electric stock quotation board, together with all display panels and connections. The average cost to the appellee of the tangible personal property installed on a customer's premises under a "board" contract was $16,522 for 1962, $15,501 for 1963, $14,660 for 1964, $13,779 for 1965 and $12,588 for 1966.

The appellee's charges do not vary or depend upon the number of electronic impulses transmitted to a broker's premises and do not vary or depend upon the number of transactions reflected on the broker's "quote" board.

During the audit period, the appellee also had two basic types of interrogation devices known as Telequote I

and Telequote III. Apparently only Telequote III devices were installed in Ohio. This device was available in two styles—a tape unit which displayed the information on paper tape, and the video which displayed the information on cathode-ray tubes.

Under appellee's interrogation device contracts, the appellee contracted with the subscribers to install and maintain control units in either video or tape desk units on the subscriber's premises. The average cost of the tangible personal property installed on a customer's premises under an interrogation contract was $6,644 for 1964, $7,225 for 1965 and $7,850 for 1966.

Appellee's contracts provided for a charge of a basic amount per month for each installation, and an additional charge per month for each video desk unit and each tape desk unit.

The quotation information received at the Telecenter is fed into three computers which analyze and store the information. Approximately 85 persons are employed at the Telecenter to perform various functions essential to the continued operation of appellee's information service. There are several groups or sections of personnel who receive, edit, transform and prepare the raw information received by the Telecenter from the various stock and commodity exchanges. Communication experts are always available to monitor incoming and outgoing electrical impulses in order to correct signal distortions which frequently occur.

Approximately 25 persons are employed at the several Satellites, to which the processed information is transmitted over lines leased by appellee from American Telephone & Telegraph Company or Western Union. These 25 persons perform various functions which insure that the information to be received by appellee's subscribers is efficiently and continuously received from the Telecenter, stored in appellee's computers and transmitted to appellee's subscribers. Each day, the circuits are tested between the Telecenter and the Satellites and between the Satellites and the premises of the appellee's subscribers. Frequently

a Satellite is called upon by appellee's subscribers to correct errors at the subscriber's premises.

The controlling question in this case may be stated as follows: Are these activities of The Bunker-Ramo Corporation "personal service transactions" as that term is used in Section 5739.01(B), Revised Code?

The Tax Commissioner, appellant, contends that these activities are not "personal service transactions" and The Bunker-Ramo Corporation, appellee, asserts that they are "personal service transactions."

The appellee relies upon the holding of this court in *American District Telegraph Co.* v. *Porterfield* (1968), 15 Ohio St. 2d 92. The appellant contends that that case is not controlling.

Section 5739.01, Revised Code, in pertinent part, provides:

"As used in Sections 5739.01 to 5739.31, inclusive, of the Revised Code:

"* * *

"(B) 'Sale' and 'selling' include all transactions by which title or possession, or both, of tangible personal property, is or is to be transferred, or a license to use or consume tangible personal property is or is to be granted * * * for a consideration in any manner * * * whether for a price or rental, in money * * *. Other than as provided in this section, 'sale' and 'selling' do not include professional, insurance, or *personal service transactions* which involve the transfer of tangible personal property as an inconsequential element, for which no separate charges are made." (Emphasis added.)

Section 5739.02, Revised Code, levies a tax on retail sales. It provides, in pertinent part, as follows:

"In the case of a sale, the price of which consists in whole or in part of rentals for the use of the thing transferred, the tax shall, as regards such rentals, be measured by the installments thereof."

The appellee's transactions are "sales," under the provisions of Section 5739.01(B), Revised Code, quoted above, because they involve the transfer of possession and

licenses to use tangible personal property (*American District Telegraph Co., supra*), unless these transactions are found to be "personal service transactions." *Randall Park Jockey Club* v. *Peck* (1954), 162 Ohio St. 245; *Recording Devices, Inc.,* v. *Bowers* (1963), 174 Ohio St. 518.

An examination of the record indicates that the activity which the appellee performs is a completely mechanized service transaction. It is not a *personal* service transaction in the sense that there are no people engaged in serving directly the subscribers of appellee. This service is rendered automatically by computers, communication lines and reception and display instruments. It is true that a relatively small number of people are required to oversee, maintain and service these devices.

The appellee contends that such activities constitute "personal service transactions" because they render service which is tailored to the personal needs of its subscribers. It appears, however, that this is a broader, more comprehensive and different definition of "personal service transactions" than was intended when this language was enacted by the Ohio General Assembly.

The record does not support the conclusion that these devices on the premises of the subscribers are "an inconsequential element" of these transactions.

The appellee relies upon the case of *American District Telegraph Co.* v. *Porterfield, supra.* That case, however, is distinguishable. In that case, the alarms which were situated upon the subscribers' premises served to alert the American District Telegraph Company, which company then contacted the local authorities and advised them of the alarm from the subscribers' premises. Once the alarm was received, the American District Telegraph Company sent its employees to the subscribers' property to protect that property.

No constitutional question has been asserted in this case by the appellee as was raised in *General Data Corp.* v. *Porterfield,* 21 Ohio St. 2d 223, Roman numeral I in the opinion.

The record discloses that the appellant assessed, for

the sales tax, the full amount of the rental charges made by appellee to its subscribers. The record shows also that the appellee collected and remitted commodity exchange fees from its subscribers to the commodity exchanges, the appellee acting merely as a collecting agent for the exchanges. Those fees collected and remitted are not properly assessable for the sales tax. This is conceded by the counsel for the appellant. (Section 5739.01(H), Revised Code.) This will require a reduction in the tax base in the assessment and a reduction in the amount of the tax.

The decision of the Board of Tax Appeals is reversed and the cause is remanded to the Board of Tax Appeals for a recomputation of the assessment and the amount of the tax in accordance with this opinion.

*Decision reversed.*

SCHNEIDER, HERBERT, DUNCAN and CORRIGAN, JJ., concur.

TAFT, C. J., dissents for the reasons stated in Roman numeral I of the opinion in *General Data Corporation* v. *Porterfield*, 21 Ohio St. 2d 223.

MATTHIAS, J., not participating.